**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO.  3:20-CV-00254-CHB-CHL**

SHIRLEY MARTIN,                                                                    **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**                                    **Defendant.**

<u>**CORRECTED REPORT AND RECOMMENDATION**</u>

Before the Court is the Complaint (DN 1) of Plaintiff Shirley Martin ("Martin"), seeking

judicial review of the final decision of the Commissioner of Social Security (the "Commissioner").

*See* 42 U.S.C. § 405(g) (2020).  On December 18, 2020, Martin filed her Fact and Law Summary

(DN 17), and in response, on January 18, 2021, the Commissioner filed his Fact and Law Summary

(DN 18).  This case was referred to the undersigned Magistrate Judge to prepare a report and

recommendation.  Therefore, this matter is ripe for review.

**I.      FINDINGS OF FACT**

On January 24, 2017, Martin filed applications for Disability Insurance Benefits ("DIB")

and Supplemental Security Income Benefits ("SSI").  (DN 15, at PageID # 170-71.)  Martin alleged

that she was disabled as of January 1, 2017 due to arthropathies and degenerative discogenic back

disorders.  (*Id.*, at PageID # 170.)  On March 29, 2017, Martin's applications were denied, and on

June 12, 2017, Martin's claims were again denied upon reconsideration.  (*Id.*, at PageID # 170-

73.)  An Administrative Law Judge ("ALJ") conducted a hearing on Martin's applications on

January 9, 2019.  (*Id.*, at PageID # 40-71.)  During the hearing, the ALJ heard testimony from

Martin, who was represented by counsel, as well as vocational expert Christopher Ryman.  (*Id.*)

In a decision dated April 3, 2019, the ALJ engaged in the five-step evaluation process promulgated

by the Commissioner to determine whether an individual is disabled, and in doing so, made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.

2. The claimant has not engaged in substantial gainful activity since January 1, 2017, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: degenerative joint disease, left knee; degenerative disc disease, lumbar spine; venous insufficiency, bilateral lower extremities, status-post left lower extremity venous ablation; fibromyalgia; osteoarthritis, right shoulder; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that she can lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently. The claimant can stand and/or walk for 4 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. She can occasionally climb ramps or stairs, but she can never climb ladders, ropes or scaffolds. She can frequently balance and she can occasionally stoop, kneel, or crouch; but she can never crawl. Lastly, she should avoid concentrated exposure to vibration or hazards such as unprotected heights or dangerous machinery.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 24, 1970 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.*, at PageID # 80-91.)

Martin filed a request for review, and on February 8, 2020, the Appeals Council denied her request, at which point, the ALJ's decision became the final decision of the Commissioner. (*Id.*, at PageID # 71-73.) On April 6, 2020, Martin timely filed this action. (DN 1.)

## II.   CONCLUSIONS OF LAW

The Social Security Act authorizes payment of disability insurance and supplemental social security benefits to persons with disabilities. Social Security Act, Disability Insurance Benefits, 42 U.S.C. §§ 401-34; Social Security Act, Supplemental Social Security Income, 42 U.S.C. §§ 1381-85. An individual shall be considered disabled if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *See* 42 U.S.C. § 423.

### A.  Standard of Review

The Court may review the final decision of the Commissioner; however, the Court may only consider whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence" is "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971).  The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see also Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the Court determines the ALJ's decision is supported by substantial evidence, the Court "may not even inquire whether the record could support a decision the other way").  However, "failure to follow agency rules and regulations" constitutes a lack of substantial evidence, even where the Commissioner's decision can be justified by the record.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### B.  Five Step Sequential Evaluation Process

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating a disability claim.  20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.  In summary, the evaluation process proceeds as follows:

> (1) Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.
>
> (2) Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.
>
> (3) Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.
>
> (4) Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work? If the answer is "yes,"

the claimant is not disabled. If the answer is "no," proceed to the next step.

(5) Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

*Id.* The claimant bears the burden of proof with respect to steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden only shifts to the Commissioner at step five to prove the availability of other work in the national economy that the claimant is capable of performing. *Jordan v. Comm'r of Soc. Sec.*, 548 F. 3d 417, 423 (6th Cir. 2008). The claimant always retains the burden of proving lack of RFC. *Id.*; *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

## C. Martin's Contentions

Martin alleges that the ALJ's determination of her RFC at step four of the five-step sequential process failed to consider relevant evidence on the record and that error led to subsequent errors at step five. (DN 17, at PageID # 758-62.) Specifically, Martin argues that the ALJ's conclusion that Martin was able to sustain an eight-hour workday with up to four hours standing or walking and able to frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds was not supported by substantial evidence, and as a result, the ALJ's finding that Martin was able to perform numerous jobs available in the national economy and was therefore not disabled was erroneous. (*Id.*, at PageID # 758-64.) Both of Martin's contentions are addressed below.

### 1. The Limiting Effects of Martin's Impairments

In assessing a claimant's residual functional capacity, the ALJ must necessarily consider the subjective allegations of the claimant and make findings. 20 C.F.R. §§ 404.1529, 416.929;

Social Security Ruling ("SSR") 16-3p.  A claimant's statement that she is experiencing pain or other symptoms will not, taken alone, establish that she is disabled; there must be medical signs and laboratory findings which show the existence of a medical impairment that could reasonably be expected to give rise to the pain or other symptoms alleged.  20 C.F.R. §§ 404.1529(a), 416.929(a).  In determining whether a claimant suffers from debilitating pain or other symptoms, the two-part test set forth in *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986), applies.  First, the ALJ must examine whether there is objective medical evidence of an underlying medical condition.  If there is, then the ALJ must determine: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain." *Id.*  When, as in this case, the reported pain and/or other symptoms suggest an impairment of greater severity than can be shown by objective medical evidence, the ALJ will consider other information and factors which may be relevant to the degree of pain alleged.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Relevant factors the ALJ may consider in determining the extent to which pain is of disabling severity include the treatment sought to treat the allegedly disabling pain, medication used to alleviate the pain, and the claimant's level of activity in daily life.  20 C.F.R. §§ 404.1529(c)(3)(i),  416.929(c)(3)(i),  404.1529(c)(3)(v),  416.929(c)(3)(v),  404.1529(c)(3)(iv), 416.929(c)(3)(iv).  The ALJ may also consider whether there are "any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence . . . ."  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

Here, the ALJ found that Martin's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; [but] [Martin]'s statements concerning the intensity,

persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."  (DN 15, at PageID # 86.)

Martin alleges several errors by the ALJ reaching this conclusion, including that the ALJ failed to properly consider the limiting effects of her obesity, fibromyalgia, and knee impairments and failed to accurately assess her RFC.

### a.  Level of Obesity

Martin argues that the ALJ failed to consider her level of obesity in assessing the limiting effects of her symptomatic pain.  (DN 17, at PageID # 758.)  Martin notes that the ALJ concluded that she was obese during the relevant period because her BMI of 58.4 meets the definition of obesity, but that the ALJ omitted that under SSR 02-1P, her BMI meets the definition of "extreme" obesity, "representing the greatest risk for developing obesity related impairments."  (*Id.*)  *See* SSR 02-1P 2002 WL 34686281 at *2.  Additionally, Martin notes that while the ALJ generally stated that she considered Martin's obesity, the ALJ did not articulate how it was considered or why it did not substantiate the level of pain Martin alleged.  (*Id.*)

Addressing the impact of Martin's obesity on the ALJ's finding, the Commissioner, observes that the ALJ acknowledged Martin's obesity and recognized the guidance of SSR 02-01P providing that the "combined effects of obesity with other impairments may be greater than might be expected without obesity."  (DN 18, at PageID # 771) (quoting DN 15, at PageID # 88.)  The Commissioner notes that the ALJ expressly stated that she considered Martin's obesity in her RFC finding.  (*Id.*)  The Commissioner also cites to *Belcher o/b/o Belcher v. Comm'r of Soc. Sec.*, 2018 WL 3964832 at *3 (W.D.Ky August 17, 2018), in which Magistrate Judge Lanny King found that the plaintiff's obesity was properly considered by the ALJ other factors considered by the ALJ would have resulted in a less restrictive RFC but for the obesity.  (*Id.*, at PageID # 771-72.)

Social Security Ruling ("SSR") 02-1P requires ALJs to consider obesity at steps two through five of the disability determination.  SSR 02-1P 2002 WL 34686281 at *3; *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016).  SSR 02-1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat*, 359 F. App'x at 576 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411–12 (6th Cir. 2006)).  Obesity "must be considered throughout the ALJ's determinations," "precisely because the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015).

The undersigned finds that the ALJ's evaluation of Martin's obesity was legally adequate.  At step two, the ALJ determined that obesity was among the severe impairments that significantly limit Martin's ability to perform basic work activities.  (DN 15, at PageID # 83.)  At step four, the ALJ considered Martin's self-reported height and weight at the time of the hearing, determined that her BMI was 58.4, noted that a BMI above 30 is considered in the obese range, and concluded that Martin met the definition of obesity.  (*Id.*, at PageID # 88.)  The ALJ also noted that Martin's obesity related treatment includes regularly seeing a bariatric surgeon, and that despite having undergone bariatric surgery, Martin still struggles with her weight.  (*Id.*)  The ALJ cited to SSR 02-1P in recognizing that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." (*Id.*)  The ALJ accordingly "considered the combined effects of the claimant's obesity with her other impairments when reaching the findings herein." (*Id.*)

The ALJ did not error in failing state that Martin's level of obesity meets the definition of "extreme" obesity under SSR 02-1P.  The levels of obesity described in SSR 02-1P, which restate

the criteria established by the National Institute of Health for diagnosis of obesity, consist of three levels distinguished solely by BMI.  SSR 02-1P 2002 WL 34686281 at *2.  Thus, in stating Martin's precise BMI and comparing it with the threshold obesity BMI, the ALJ implicitly recognized Martin's degree of obesity.  Moreover, categorizing Martin's level obesity was not necessary to for the ALJ to determine its limiting effects.  *See id.* ("These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.")

The ALJ also sufficiently articulated how the effects of Martin's obesity were considered. The ALJ recognized that "[a]n individual may have limitations in any of the exertional functions, postural functions, and in her ability to tolerate hazards because of obesity."  (DN 15, at PageID # 88.)  This is consistent with the opinions of the state agency medical consultants that Martin "is capable of light exertion level work with additional postural and environmental limitations."  (*Id.*, at PageID # 89.)  Although the ALJ afforded their opinions great weight, in determining Martin's RFC, the ALJ considered additional evidence and "further limited the claimant's ability to perform postural functions and tolerate hazards." (*Id.*)  Thus, the ALJ sufficiently accounted for the specific limiting effects of Martin's obesity.

### b.  Fibromyalgia

Martin next argues that the ALJ failed to properly consider evidence related to her fibromyalgia in assessing its limiting effects.  (*Id.*, at PageID # 759, 761.)  Martin notes that in finding that her fibromyalgia did not impose or contribute to any disabling limitation, the ALJ relied on the fact that in October 2018, Martin began using hydrocodone, which was "partially effective" in treating her pain, and that Martin continued to ambulate without an assistive device, did not display any neurological deficits, and had intact sensation and strength.  (*Id.*)  Martin notes that her alleged functional limitations are based on pain, and that "[a]mbulation, neurological

deficits, intact sensation, and strength are not diagnostic of the extent of pain." (*Id.*, at PageID # 759.)  Martin argues that in relying on these factors to contradict her alleged limitations, the ALJ failed to comply with process required by SSR 12-2P to evaluate symptoms of fibromyalgia and failed to explain how these factors are indicative of the extent of Martin's pain. (*Id.*)  Martin also asserts that the ALJ did not indicate that she considered the effect of Martin's fibromyalgia in combination with Martin's obesity, degenerative joint disease, degenerative disc disease, and osteoarthritis. (*Id.*)  Finally, Martin notes that the ALJ's reliance on Martin's "partially effective" use of hydrocode beginning in October 2018 does not account for the twenty intervening months since the onset date without that medication nor explain "why the Fibromyalgia pain, individually or in combination with the other severe impairments, was not disabling in that period." (*Id.*)

Addressing Martin's arguments about the ALJ's assessment of her fibromyalgia, the Commissioner argues that the ALJ recognized Martin's diagnosis, and properly considered the factors Martin challenges, and reasonably concluded that they were not consistent with disabling limitations. (DN 18, at PageID # 774.)  The Commissioner noted that the Sixth Circuit has held that a diagnosis of fibromyalgia does not *per se* result in disability, but that the ALJ nonetheless found Martin's fibromyalgia was a severe impairment which she accounted for in assessing her RFC for light work. (*Id.*)  Finally, the Commissioner states that in considering the limiting effect of Martin's fibromyalgia, the ALJ looked beyond the objective medical evidence and considered Martin's activities and abilities, her treatment regimen, and her lack of follow through with treatment recommendations." (*Id.*)

Fibromyalgia is an unusual impairment in that its symptoms are often not supported by objective medical evidence. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) ("On at least one occasion, we have recognized that fibromyalgia can be a severe impairment and

that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."). However, a diagnosis of fibromyalgia does not automatically entitle a claimant to disability benefits. *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008). The ALJ must make a finding about the credibility of the person's statements regarding the effects of her symptoms on functioning. *See* SSR 12-2P, 2012 WL 3104869 at *5. For the ALJ to find someone disabled due to fibromyalgia, there must be objective evidence sufficient to support a finding that the person's impairments so limit her functional abilities that it precludes her from performing any substantial gainful activity. *Id.* at *2.

Here, at step two of the five-step evaluation process, the ALJ made a specific finding that Martin had a severe impairment of fibromyalgia. (DN 15, at PageID # 83.) At step four, the ALJ considered Martin's treatment history for fibromyalgia, including that she has tried over nine medications that either she did not tolerate or caused an allergy. (*Id.*, at PageID # 87.) The ALJ noted that in October 2018, Martin reported that hydrocodone was "partially effective." (*Id.*, at PageID # 88.) The ALJ acknowledged that clinical findings consistently showed points of tenderness, but that "despite her reports of pain, the claimant continued to exhibit the ability to ambulate without an assistive device, and exhibited no neurological deficits, intact sensation, and intact strength." (*Id.*)

The ALJ also considered Martin's activities of daily living. A plaintiff's level of daily activity is a factor which the ALJ may consider in determining the extent to which pain is of disabling severity. 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993); *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (As a matter of law, the ALJ may consider household and social activities in evaluating complaints of disabling pain.). Here, the ALJ noted that Martin's regular activities included

working part-time throughout the relevant period, teaching a Sunday school class, living independently, shopping, driving, and household tasks.  (DN 15, at PageID # 87.)  The ALJ thus found that Martin's "ability to engage in these activities is not supportive of her allegations that she cannot engage in any physical activity." (*Id.*)  Based on the foregoing as well as an independent review of the evidence on record, the undersigned finds that the ALJ's determination that the limiting effects of Martin's fibromyalgia were not disabling is supported by substantial evidence.

Martin argues that the ALJ's assessment of her activities of daily life fails to consider several statements by Martin that indicate greater functional limitation.  (DN 17, at PageID # 761.)  For example, the ALJ omitted from the decision that Martin reported that she completes daily activities when she is not in pain, does not do her own yard work, needing to elevate her leg after her two hour work shifts, and has a six hour break between shifts.  (*Id.*)  While it would have been preferable for the ALJ to have included this mitigating evidence in the decision, her failure to do so does not undermine the substantial evidence supporting her decision.  *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) (The presence of "substantial evidence in the record that would have supported an opposite conclusion" is not equivalent to a finding that substantial evidence does not support the ALJ's findings.).

Martin's arguments that the factors considered by the ALJ (ambulation, lack of neurological deficits, sensation, and strength) are unrelated the limiting effect of her pain is unpersuasive.  Under SSR 12-2P, the ALJ may consider all evidence in the case record in order to "evaluate the intensity and persistence of the person's pain . . .  and determine the extent to which [the pain] limit[s] the person's capacity for work."  SSR 12-2P, 2012 WL 3104869 at *5.  Martin alleged that her chronic pain limits her functioning to an extent that she is unable to work.  The evidence the ALJ relied on is indicative of her capacity to work notwithstanding her pain.  *See*

*Wheeler v. Comm'r of Soc. Sec.*, No. 3:17-CV-503-DJH, 2019 WL 1141798, at *5 (W.D. Ky. Feb. 22, 2019), report and recommendation adopted, No. 3:17-CV-503-DJH-CHL, 2019 WL 1139493 (W.D. Ky. Mar. 12, 2019) (In assessing a light work RFC for claimant with fibromyalgia, "[t]he ALJ also [] that [the claimant's] treatment records reflected good overall mobility and use of extremities, as well as no problems with her gait, station, balance, or coordination.")

Martin's argument that the ALJ should have found pain caused by her fibromyalgia was disabling prior to beginning the "partially effective" hydrocodone treatment is also unpersuasive. Just because Martin was suffering to a greater degree from her fibromyalgia symptoms during that period, that does not mean the symptoms rendered her disabled. *See Vance*, 260 F. App'x at 806. Further, the ALJ considered additional evidence on record that indicated that Martin was *not* disabled during that period, including her activities of daily life and the opinions of the state agency medical consultants.  (DN 15, at PageID # 88-89.)  Therefore, the ALJ was not required to separately explain why the absence on the "partially effective" hydrocodone treatment did not render Martin disabled prior to October 2018.

### c.  Knee Impairment

Martin argues that the ALJ failed to properly consider evidence of the limiting effects of her knee impairment. (DN 17, at PageID # 759-761.)  Martin objects to the ALJ's finding that the evidence of Martin's left knee osteoarthritis and complete loss of medial joint space was only "somewhat consistent" with Martin's allegation of disabling limitations.  (*Id.*, at PageID # 759-60.)  Martin notes that although these impairments were diagnosed and confirmed through x-ray imaging, the ALJ discounted their limiting effect because Martin frequently exhibited normal gait, full strength and sensation and no neurological deficits, but only "sometimes" exhibited an antalgic gait and decreased range of motion in the left knee.  (*Id.*, at PageID # 760.)  Martin states that

because the ALJ did not explain the significance of the normal findings or their frequency, "[i]t is unclear as to the relevance of normal strength and normal sensation and absence of neurological deficits to the diagnosis and symptoms of the degenerative conditions confirmed by x-ray." (*Id.*) Martin further argues that the ALJ's finding is inconsistent with the determination by her treating orthopedic surgeon that Martin's condition was a basis for total knee replacement. (*Id.*) Martin notes that despite the fact that the prescribed knee replacement was not immediately recommended because of her age and obesity, the ALJ concluded that the clinical findings and use of only conservative treatments disputed Martin's alleged pain levels. (*Id.*) Martin argues that "the need for a total knee replacement along with morbid obesity and partially resolved fibromyalgia pain militate against the conclusion that Martin can sustain light work in the ordinary workplace for an 8-hour day, 5 days a week." (*Id.*, at PageID # 761.)

In response, the Commissioner notes that the ALJ considered the extent of Martin's diagnoses and treatments related to her knee impairments and concluded that the overall evidence failed to support the alleged limitations. (DN 18, at PageID # 775.) The Commissioner cites to *Pierce v. Comm'r of Soc. Sec.*, 2017 WL 4366748 at *5 (W.D.Ky September 29, 2017), in which a determination of no disability was upheld when the claimant's treatment had been conservative, had not required serious treatment or surgery, and was not prescribed strong medication. (*Id.*) The Commissioner argues that Martin's claim that knee replacement is necessary "is thus undercut by the evidence that doctors ruled out this possibility because of her youth and her weight." (*Id.*)

Here, at step two of the five-step evaluation process, the ALJ made a specific finding that Martin had severe musculoskeletal impairments, including degenerative joint disease to the left knee, degenerative disc disease in her lumbar spine, and osteoarthritis to the right shoulder. (DN 15, at PageID # 83.) At step four, the ALJ considered Martin's diagnostic and treatment history

for these impairments.  (*Id.*, at PageID # 86-87.)  Regarding her left knee joint impairment, the ALJ noted that Martin had a history of treatment for pain in her left knee, and that prior to the onset date, she had undergone physical therapy and injections which Martin reported were ineffective in treating the pain.  (*Id.*, at PageID # 86.)  The ALJ noted a January 24, 2017 treatment report of Martin's orthopedic surgeon Jeremy W. Tarter, stating that recent x-rays showed osteoarthritis with peripheral osteophytes that were arthritic and patellofemoral disease and a September 2018 x-ray which revealed moderate-to-severe degenerative changes as well as a complete loss of the medial joint space in the varus knee.  (*Id.*)  The ALJ stated that these records confirm the diagnoses of Martin's knee impairment, but do not on their own "demonstrate[] disabling functional limitations."  (*Id.*)

The ALJ then reviewed clinical findings, which the ALJ found were inconsistent in as to the disabling effect that her knee impairment had on her functional capacity.  (*Id.*, at PageID # 86.)  Specifically, the ALJ noted that Martin sometimes exhibited an antalgic gait and decreased range of motion in her left knee, but that she "frequently exhibited a normal gait, full strength and sensation in her extremities, and no neurological deficits."  (*Id.*, at PageID # 87.)  Finally, the ALJ reviewed Martin's treatment history, which included conservative treatments such as pain management, steroid injunctions, and physical therapy.  (*Id.*)  The ALJ noted that Martin reported that the conservative treatments were ineffective in relieving her pain, but that she has not required corrective surgery.  (*Id.*)  The ALJ also noted that in a treatment report dated January 24, 2017, Martin's orthopedic surgeon stated that Martin's knee impairment would impact her future employability, but did not afford that opinion "any significant weight" because "opinions regarding the claimant's ability to work are reserved to the Commissioner."  (*Id.*, at PageID # 88.)  The ALJ concluded that "the pattern of clinical findings and conservative treatment she underwent

15

does not support the claimant's allegations of disabling limitations." (*Id.*)  Based on the foregoing, the undersigned finds that the ALJ's determination that the limiting effects of Martin's knee impairment was not disabling is supported by substantial evidence.

Martin's argument disputing the ALJ's finding that clinical findings were only "somewhat consistent" with disabling limitations is unpersuasive.  In determining the extent to which symptoms of an impairment are of disabling severity the ALJ may consider whether there are "any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence . . . ."  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Here, Martin has alleged that the symptoms of her knee impairment had a limiting effect that rendered her unable to work.  The ALJ noted evidence supporting her allegation, namely, that she sometimes had an antalgic gait due to knee pain and sometimes showed decrease range of motion in her left knee.  (DN 15, at PageID # 87.)  The ALJ also noted conflicting evidence, namely, that she frequently walked with a normal gait, exhibited full strength and sensation in her extremities, and exhibited no neurological deficiencies.  (*Id.*)  Contrary to Martin's assertion that the ALJ failed to explain the significance of this evidence, the ALJ concluded based on the evidence taken together that Martin "showed only mild to moderate abnormalities in her functioning related to her left knee impairment."  (*Id.*)  Additionally, contrary to Martin's suggestion that these objective observations of Martin during physical exams are not relevant when her impairment was confirmed by x-ray, the ALJ explained that the x-ray results confirmed the diagnosis of the impairment, but that additional evidence, such as the clinical findings at issue, was needed to determine the limiting functional effects.  (*Id.*, at PageID # 86-87.)

Martin's argument that the ALJ's finding that Martin's treatment history was not indicative of disabling pain is not consistent with the recommendation by her orthopedic surgeon for a total

knee replacement is also unpersuasive.  The ALJ considered the various conservative treatments, observed that she has not yet required corrective surgery, and noted that her orthopedic surgeons indicated that her age and weight prevent her from undergoing total knee replacement.  (*Id.*, at PageID # 87.)  The ALJ was permitted to infer from the use of conservative treatments and lack of a more drastic intervention that Martin's symptoms were not as severe as she alleged.  *See Lester v. Soc. Sec. Admin.*, 596 Fed.App'x. 387, 389 (6th Cir. 2015) ("Dr. Perry's proposed limitations were inconsistent with his own treatment notes from the relevant period, which generally showed that Lester was receiving conservative treatment and that he was not suffering from disabling impairments.")

Contrary to Martin's assertion, the record does not indicate that "a total knee replacement was needed because the conservative treatment failed."  (DN 17, at PageID # 760-61.)  Rather, the records from her treating physicians show that on January 4, 2017, orthopedic surgeon Dr. Charles C. Key discussed the option of knee replacement with Martin and told her that given her age and weight, he "would not recommend a knee replacement at this time due to concerns about longevity of the implant and difficulty of the procedure."  (DN 15, at PageID # 492.)   Dr. Key also told Martin "that other surgeons might feel differently and I will be happy to refer her to Dr. Tarter for a second opinion."  (*Id.*)  After a follow-up examination and review of her recent x-rays, on January 24, 2017, orthopedic surgeon Dr. Jeremy W. Tarter concluded: "I do not think radiographically she is a surgical candidate no matter her weight."  (*Id.*, at PageID # 489.)  Finally, in a September 19, 2018 treatment note, orthopedic surgeon Dr. Samuel C. Coy recommended cortisone injections to the left knee to treat continuing pain and stated that "if conservative treatment measures fail considering that she has had a weight loss surgery already I think she would be a reasonable candidate eventually for knee replacement."  (*Id.*, at PageID # 733.)  The same note is included in

an October 18, 2018 treatment note authored by Dr. Coy.  (*Id.*, at PageID # 730.)  These records from her treating orthopedic surgeons show inconsistent recommendations, none of which state that knee replacement surgery was necessary.  Therefore, the ALJ did not error in considering Martin's use of conservative treatments rather than surgical or other more drastic interventions inconsistent with Martin's allegation of disabling functional limitation.

### d.  Martin's RFC

Martin argues that in determining her RFC, the ALJ did not sufficiently explain how "the objective evidence showing a left knee that needed surgery—a total knee replacement—allowed a five-foot six-inch, 365-pound person with both degenerative disc disease in the lumbar spine and Fibromyalgia could sustain an eight-hour day with four hours on her feet frequently lifting ten pound and occasionally lifting 20 pounds." (DN 17, at PageID # 763.)  Specifically, Martin argues that in assessing Martin's RFC, the ALJ failed to consider the record as a whole.  (*Id.*, at PageID # 761-63.)   Martin also argues that the ALJ assigned undue weight to the opinions of non-examining state agency medical consultants Douglas Back and Howard Markowitz and to the opinions of her treating orthopedic surgeons Dr. Tarter and Dr. Key.  (*Id.*, at PgeID # 761-62.)

### i.  RFC in General

The RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations.  20 C.F.R. §§ 404.1545(a), 404.1546(c). The ALJ makes this determination based on a consideration of medical source statements and all other evidence in the case record.  20 C.F.R. §§ 404.1529, 404.1545(a)(3), 404.1546(c).  Here, the ALJ found that Martin's RFC included, in relevant part,  "that she can lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently . . . [and] can stand and/or walk for 4 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday." (DN 15, at PageID # 85.)  In support of

her determination of Martin's RFC, the ALJ reviewed Martin's medical and treatment history with respect to each of Martin's severe impairments.  (*Id.*, at PageID # 86-88.)  Although the ALJ found that none of the impairments on their own or combined imposed disabling limitations, the ALJ found that Martin's right shoulder impairment and degenerative disc disease limited "her ability to lift and/carry objects and in her ability to perform postural functions."  (*Id.*, at PageID # 87.)

The ALJ also considered Martin's activities of daily life, noting that Martin testified that she works part-time "which includes climbing on stairs on a bus, and walking children across a crosswalk."  (*Id.*)   The ALJ also noted that she performs personal care tasks, cooks meals, shops, and is able to complete household chores with breaks. (*Id.*)  The ALJ noted that Martin reported difficulties performing some tasks, such as buttoning clothes.  (*Id.*)  Finally, the ALJ considered the opinions of state agency medical consultants in their RFC recommendations, assigning their opinions "great weight," and the opinions of Martin's orthopedic surgeons to which she assigned "little weight" due to her finding that their opinions were inconsistent with the record.  (*Id.*, at PageID # 89.)   Based upon the ALJ's thorough discussion of the relevant records, the undersigned finds that the ALJ consideration of evidence in the record adequate to support her conclusion as to Martin's RFC.

Martin argues that the ALJ's characterization of her treatment for her right shoulder impairment was not accurate.  (DN 17, at PageID # 761.)  The ALJ noted that Martin received physical therapy from December 2015 to March 2017, and upon discharge, she was noted to have reached all short-term goals and "essentially all long-term goals, which included reducing her pain and increasing her active range of motion to within normal limits."  (DN 15, at PageID # 87.)  Martin asserts that the long-term goals were not met, and although her pain levels reduced, they shortly returned.  (DN 17, at PageID # 761.)  Martin cites to a physical therapy discharge note

dated January 5, 2016, in which Martin is noted not to have met her long-term goals at that time after six sessions.  (*Id.*) (citing DN 15, at PageID # 496.)  However, in a physical therapy discharge note dated March 24, 2017, Martin was noted to have met two of her long-term goals and was working toward the third.  (DN 15, at PageID # 560.)  The fact that in January 2016, prior to the alleged onset date, Martin was not meeting her physical therapy goals does not undermine the ALJ's well-supported finding that Martin had reached most of her physical therapy goals by March 2017.

Martin also notes that the ALJ's decision omitted that subsequent to her discharge from physical therapy, an MRI indicated an impingement in the shoulder, and that "[t]he ALJ provided no explanation why the omitted impingement finding was not a factor in frequent use of the shoulder."  (*Id.*)  In a treatment note following an MRI to Martin's right shoulder dated May 8, 2017, Dr. Vernon Barrow observed: "Moderate degenerate change right acromioclavicular joint. Inferiorly directed osteophytes is noted raising possibility of impingement."  (*Id.*, at PageID # 570.)  The ALJ considered this evidence and cited to the treatment note in the decision.  (*Id.*, at PageID # 87.)  The ALJ also discussed Martin's treatments following her discharge from physical therapy in March 2017, noting that she underwent a right shoulder injection and received pain relief medication.  (*Id.*)  In doing so the ALJ cites to an August 14, 2017 treatment note in which her orthopedic surgeon describes administering an injection to treat Martin's shoulder impingement.  (*Id.*, at PageID # 625.)  The ALJ ultimately concluded "right shoulder impairment and lumbar degeneration reasonably requires a reduction in her ability lift and/or carry objects, and in her ability to perform postural functions."  (*Id.*, at PageID # 87.)  While the ALJ never used the word "impingement" in the decision it is clear that the ALJ considered this condition in assessing the RFC.

### ii.   Assessment of the Opinion Evidence

As Plaintiff filed her application prior to March 27, 2017, the rules in 20 C.F.R. § 404.1527 and § 416.927 apply to the ALJ's assignment of weight to the medical opinions in the record.[1]  The regulations require the ALJ to evaluate every medical opinion in the record. 20 C.F.R. §§ 404.1527(c); 416.927(c).  The Sixth Circuit has provided the following comprehensive explanation regarding the standards for weighing medical opinions:

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), *id.* § 404.1502, 404.1527(c)(2). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).
>
> The source of the opinion therefore dictates the process by which the Commissioner accords it weight. Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).
>
> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Id.* §

---

[1] The undersigned's previous Report and Recommendation erroneously cited to 20 C.F.R. § 404.1520c, which along with 416.920c, discontinued the heightened procedural mechanics and deference when considering medical opinions by treating sources.  These regulations apply to applications for DIB and SSI filed on or after March 27, 2017.  20 C.F.R. §§ 404.1520c, 416.920c.  Here, Martin filed her applications on January 24, 2017, so her claims are governed by 20 C.F.R. § 404.1527 and § 416.927.

404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

On the other hand, opinions from nontreating and nonexamining sources are never assessed for "controlling weight." The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013).

The procedural requirements to assign weight to the opinion of a treating source and provide "good reasons" for that weight serves both to ensure adequacy of review and to give the claimant a better understanding of the disposition of his case. *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (citing *Rogers v. Comm'r*, 486 F.3d 234, 242 (6th Cir. 2007)). "These procedural requirements are 'not simply a formality' and are intended 'to safeguard the claimant's procedural rights.'" *Cole*, 661 F.3d at 937. The Sixth Circuit has indicated it will not hesitate to remand when it encounters decisions from ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion. *Id.* at 939 (citations omitted).

### 1. Dr. Tarter and Dr. Key

Martin argues that the ALJ improperly rejected the opinions of her treating orthopedic surgeons that Martin could lift and carry less than ten pounds frequently, could stand less than two hours in an eight-hour workday, needed to alternate between sitting and standing, and had

push/pull and manipulative limitations.  (*Id.*, at PageID # 762.)  The ALJ's evaluation of their opinions reads as follows:

> Drs. Tarter and Key's opinions are not supported by the record. While objective imaging and clinical findings showed some abnormalities, their opinion that the claimant cannot stand more than two hours per day is inconsistent with her activities of daily living. For example, the claimant reported that she worked approximately four hours per day as a bus monitor, which reasonably requires standing more than two hours at one time. In addition, their opinions that the claimant had manipulative and push/pull limitations is inconsistent with her testimony that she has no problem using her right upper extremity.

(*Id.*, at PageID # 89.)

The ALJ assigned "little weight" to their opinions because she found them inconsistent with the record, citing particularly the fact that Martin worked four hours per day as a bus monitor, contradicting their two-hour standing limitation, and that Martin testified that she was able to use her right upper arm, contradicting their push/pull and manipulative limitations.  (DN 15, at PageID # 89.)  Martin states that the ALJ's assertion that her job requires four hours of standing per day is mischaracterizes her activity, given that it is undisputed that her job includes a two-hour morning shift and a one-hour and forty-five-minute afternoon shift with a six-hour break between.  (*Id.*, at PageID # 88-89.)  Martin further argues that the opinion of her orthopedic surgeons regarding her push/pull and manipulative limitations was not inconsistent with the record and took into account all Martin's treatment records, including the shoulder impingement that Martin alleged the ALJ failed to consider.  (*Id.*, at PageID # 89.)

The decision is spare with respect to the required treating source analysis.  The ALJ did note that she "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927."  (*Id.*, at PageID # 86.)  At one point in the decision, the ALJ acknowledges that Dr. Tarter is Martin's "treating orthopedic surgeon," but in evaluating their medical source

statement, the ALJ refers to both Dr. Tarter and Dr. Key as "examining orthopedic surgeon[s]." (*Id.*, at PageID # 89.) The decision does not address how Dr. Key's and Dr. Tarter's status as treating sources affected the analysis or extensively discuss by name any of the § 404.1527(c) and § 416.927(c) factors.  Instead, the decision only explicitly addresses two of the seven required factors: the degree to which the opinion is consistent with the record as a whole and supported by relevant evidence.  (*Id.*)  These omissions "test[] the contours of the procedural requirements of § 404.1527." *Thaxton v. Comm'r of Soc. Sec.*, 815 F. App'x 955, 960 (6th Cir. 2020). However, the ALJ's procedural errors are not grounds for reversal because the errors were harmless.

A procedural error may be considered harmless if 1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; 2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) the Commissioner has met the goal of the procedural safeguard of providing good reasons. *Thaxton v. Comm'r of Soc. Sec.*, 815 F. App'x 955, 960 (6th Cir. 2020) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).)  Here, the third category applies.

To meet the goal of the procedural safeguards afforded to treating medical sources "the ALJ's decision, at the very least, must implicitly provide sufficient reasons for giving less weight to treating-source opinions; merely indicating a rejection of the treating-source opinions is not enough." *Id.*  (citing *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006) (per curiam).  Sufficient reasons do more than "merely indicat[e] a rejection of the treating-source opinions[.]"  *Id.*  They "make clear the specific ways in which the overall . . . record is consistent or inconsistent with the various opinions on which the decision relies—or does not rely." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 554 (6th Cir. 2020); *see also Nelson*, 195 F. App'x at 470 (upholding an ALJ's procedurally flawed decision because it sufficiently explained the reason for

the rejection of the treating physician's opinions and gave enough reasoning to allow for meaningful review).

Here, despite the deficiencies in the ALJ's analysis, the decision still provides "sufficient reasons for giving less weight to treating-source opinions" in a manner that makes clear to Martin the reasons for the denial and provides enough evidence for meaningful review. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). The ALJ provided specific reasons why she discounted the weight of the source statement by Dr. Tarter and Dr. Key. (DN 15, at PageID # 89.) The ALJ identified two of their functional assessments, Martin's push/pull and standing/walking limitations, and cited to specific evidence that contradicted their opinions. (*Id.*) Specifically, the ALJ found that their push/pull limitation was not consistent with Martin's testimony during the hearing that she no longer had functional difficulties with her right shoulder. (*Id.*) Martin argues that the push/pull and manipulative limitations were not inconsistent with the record and took into account all Martin's treatment records, including the shoulder impingement that Martin alleged the ALJ failed to consider. (DN 17, at PageID # 762.) Martin's suggestion that Dr. Tarter and Dr. Key's more restrictive push/pull limitation recommendation was supported by Martin's shoulder impingement is unlikely. Dr. Tarter and Dr. Key signed their recommendation on May 1, 2017. (DN 15, at PageID # 567.) Martin's surgeons were alerted to a possible impingement through an MRI on May 8, 2017. (*Id.*, at PageID # 570.) More importantly, their recommended upper extremity push/pull limitation was inconsistent with Martin's hearing testimony during a series of exchanges about Martin's shoulder impairment. (*See id*, at PageID # 124.) At one point the ALJ asked Martin whether she had any problems using her right arm in light of her shoulder impairment, and Martin responded: "No, it's better now in that arm." (*Id.*) Martin has not provided any explanation as to how her own testimony is not inconsistent with Dr.

Tarter and Dr. Key's assessment. *See Thaxton*, 815 F. App'x at 961 (6th Cir. 2020) (finding that the ALJ provided sufficient reasons for rejecting opinion of treating source in part because "in making its determination, the ALJ relied on claimant's own statements throughout his medical records that he was 'doing better.'")

Martin also argues that the under two hours standing/walking limitation is not inconsistent with the demands of her current job, because her job includes a two-hour morning shift and a one-hour and forty-five-minute afternoon shift with a six-hour break between. (DN 17, at PageID # 762.)  However, Martin's ability to work up to two hours at a time undermines Dr. Tarter and Dr. Key's opinion that the total time Martin can be on her feet in an eight-hour workday is *less than two hours*. Moreover, their standing/walking limitation recommendation was made through checking a box on a standard form which also gave the option to check that Martin could stand or walk "at least 2 hours in an 8-hour workday." (DN 15, at PageID # 564.)  Dr. Tarter and Dr. Key did not check that box indicating that in their opinion, Martin was unable to stand for up to two hours at a time despite the fact that Martin does so five days per week.

Although procedurally blemished, the decision under review still "serves the purpose of letting 'claimants understand the disposition of their cases.'" *Thaxton*, 815 F. App'x at 960. The ALJ did more than "dismiss [the] treating physician's opinion as 'incompatible' with other evidence of record[.]" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010). She "identif[ied] the specific discrepancies and [ ] explain[ed] why it is the treating physician's conclusion that gets the short end of the stick." *Id*.  Properly demonstrating inconsistency satisfies the good reasons requirement. *Coldiron v. Comm'r of Soc. Sec*, 391 F. App'x 435, 440 (6th Cir. 2010) ("[T]he ALJ's proffered reasons for not crediting [treating physician's] opinion satisfy the good reason requirement.")

### 2.  Dr. Back and Dr. Markowitz

In a disability determination explanation, on March 8, 2017, Dr. Back concluded that that

Martin was capable of occasionally lifting and carrying up to twenty pounds, frequently lifting and

carrying up to ten points, standing or walking up to four hours with occasional breaks, sitting up

to six hours with normal breaks, and unlimited pushing and pulling.  (DN 15, at PageID # 165-66.)

On June 12, 2017, Dr. Markowitz reached the same conclusion.  (*Id.*, at PageID # 184.)  The ALJ's

evaluation of their opinions reads as follows:

> As State agency consultants, Drs. Back and Markowitz are familiar
> with the disability determination process and the regulations
> including the terms of art and legal and medical standards set forth
> therein. In addition, Drs. Back and Markowitz based their opinions
> on a comprehensive review of the record, and their opinions are
> supported by a detailed narrative explaining what evidence they
> relied upon in reaching their conclusions. Drs. Back and Markowitz'
> opinions are consistent with physical examination findings that
> showed the claimant sometimes exhibited an antalgic gait and
> decreased active range of motion in the left knee. However, as
> detailed above, the claimant also generally exhibited full strength in
> her other extremities, intact sensation, and no neurological deficits.
> Furthermore, the claimant has been treated for her various physical
> impairments, but she has not required any corrective surgery during
> the relevant period.

(*Id.*, at PageID # 88.)

The ALJ assigned "great weight" to their opinions and adopted their RFC recommendation,

adding further limitations to Martin's postural functions and toleration to hazards based on

evidence introduced at the hearing.  (DN 15, at PageID # 89.)  Martin argues that the ALJ errored

in affording their opinions great weight for several reasons.  First, Martin asserts that Dr. Back's

and Markowitz's RFC recommendations "did not provide a detailed narrative."  (DN 17, at PageID

# 761-62.)  This is incorrect; as the ALJ noted in her evaluation of their opinions, both Dr. Back

and Markowitz accompanied their recommendations with an explanation of why the evidence

supports their conclusion. (DN 15, at PageID # 166, 184.) Martin provides no reason as to why these explanations are insufficient to support their conclusions.

Martin next argues that "**20 C.R.R. §§ 404.1520c & 416.920c** were not applied to the state agency doctor's opinions." (DN 17, at PageID # 762.) The undersigned notes that the regulations Martin cites do not apply to her claims, but will construe Martin's argument as a challenge to the ALJ application of § 404.1527(c) and § 416.927(c), which govern the ALJ's assessment of the medical opinions of the state agency consultants. Specifically, Martin argues that the supportability factor is lacking because "there is no rationalization in their opinions of the of how the moderate to severe degenerative findings and complete loss of the medial joint space findings in the September 2018 imaging, [], along with her morbid obesity and Fibromyalgia is consistent with their conclusions." (*Id.*) The reason their explanations do not account for the findings of Martin's 2018 x-ray is both of their assessments of Martin's RFC were completed in 2017. (DN 15, at PageID # 166, 184.) The ALJ acknowledged that their opinions did not reflect all evidence on the record and added further limitations to Martin's RFC based on evidence admitted at the hearing level, which including Martin's 2018 medical records. (*Id.*, at PageID # 89, 80.) Separately, the ALJ specifically considered the 2018 x-ray findings in assessing the limiting effects of Martin's knee impairment. (*Id.*, at PageID # 86.) Martin does not point to any other deficiency in the ALJ decision in meeting the requirements of § 404.1527(c) & 416.927(c).

### 2. Jobs Available in the National Economy that Martin Can Perform

At step five of the five-step sequential process, the ALJ found that, "[c]onsidering the [Martin]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [she] can perform." (DN 15, at PageID # 90.) Martin objects to this finding because it is based on the RFC, to which Martin also

objected.  Given that the undersigned found that the ALJ's RFC determination was supported by substantial evidence, the undersigned need not address this aspect of Martin's objection.  Martin also argues that the ALJ errored in relying on the vocational expert's testimony in response to the ALJ's hypothetical question as whether there would be an occupational fitting for a person with Martin's RFC, age, education, and work experience in the national economy.  (DN 17, at PageID # 762-63.)

A vocational expert's testimony can constitute substantial evidence to support the Commissioner's finding that a plaintiff is capable of performing a significant number of jobs existing in the local, regional, and national economies, *Bradford v. Sec'y of the Dep't of Health and Human Servs.*, 803 F.2d 871, 874 (6th Cir.1986) (per curiam), so long as a vocational expert's testimony is based on a hypothetical question which accurately portrays the plaintiff's physical and mental impairments.  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987).

Here, the ALJ's decision includes a statement that it may take Martin longer to perform certain tasks. (DN 15, at PageID # 88.)  Martin asserts that "the ALJ failed to provide this vocationally relevant information to the vocational expert," and thus, "the hypothetical question did not accurately portray Martin's limitations as specifically found by the ALJ."  (*Id.*, at PageID # 762, 764.)  The portion of the ALJ's decision at issue is as follows:

> Her activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations that preclude her from work activities. Although the claimant may not be able to engage in all of the activities that she did in the past and it may take her longer to perform the task, she is more active than would be if all her allegations were consistent.

(DN 15, at PageID # 88.)

Contrary to Martin's assertion, the ALJ did not specifically "f[in]d that it took Martin longer to perform tasks."  (DN 17, at PageID # 762.)  In the quoted passage, the ALJ was assessing the credibility of Martin's subjective complaints of disabling limitations. In doing so, she clarified that even though Martin *may* not be able to engage in all past activities and *may* perform tasks slower than she had in the past, her relevant limitations are not disabling.  (*See* DN 15, at PageID # 88.)  This statement was not a specific finding as to Martin's RFC.  Moreover, Martin has not cited any evidence to suggest that the RFC determination did not account for the pace at which Martin is able to perform tasks.  *See Shirley v. Colvin*, No. 1:13CV-00038-JHM, 2013 WL 5818904, at *10 (W.D. Ky. Oct. 29, 2013) ("[T]here is no requirement that the Administrative Law Judge's hypothetical question to the vocational expert reflect plaintiff's unsubstantiated complaints.")

The ALJ's hypothetical question to the vocational expert restated the well-supported RFC determination.  (DN 15., at PageID # 133.)  The RFC was based on the opinions of state agency medical consultants Dr. Back and Dr. Markowitz as to what level of work Martin was capable of performing, as well as additional limitations based on the ALJ's consideration of further evidence.  (*Id.*, at PageID # 89.)  *See Shirley*, 2013 WL 5818904, at *10 (citing *Hardaway v. Sec'y of Health and Human Servs.*, 823 F.2d 922, 927–28 (6th Cir.1987) (per curiam) ("The hypothetical question is not erroneous where at least one doctor substantiates the information contained therein.")  Therefore, the vocational expert's testimony constitutes substantial evidence supporting the ALJ's finding that Smith is not disabled and could perform work that exists in the national economy.

## III.  RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the final decision

of the Commissioner be **AFFIRMED.**

Colin H Lindsay, Magistrate Judge

United States District Court

July 15, 2021

cc:  Counsel of record

## Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).